Good afternoon, your honors. Actually, good morning. Jonathan Stiglitz for Appellant Healthcare Ally Management of California, LLC. Thank you, your honors, for allowing me the opportunity to give oral argument here today. May it please the court. The issue before the court today is whether a medical provider can ever assert its own claim against an ERISA plan or ERISA insurer in common law based on the medical provider's direct interactions with those ERISA entities. That's the question, I believe. That's before the court today. Your client's standing in the shoes of Lapeer? Correct. To me, part of the case could reduce to a simply, are you accepting the Bristol decision and distinguishing it, or are you saying Bristol isn't consistent with controlling law? I think I could accept, I think we certainly could accept the Bristol decision. I think there's certainly... You have to, so why don't we go on in that case? I would accept the Bristol decision. I think we can distinguish it. I think there's the last paragraph of Bristol makes the point of saying these negligent misrepresentation claims are, they still exist. It wasn't going to that, it wasn't getting to that issue. It specifically, and I was going to start off with a quote, actually, from one of the cases that it distinguishes itself from, which was Lordman, where in the Lordman case, I find this quote to be very appropriate, when employers and employees gave up state law causes of action because of ERISA, they received federal causes of action under ERISA in exchange. On the other hand, ERISA does not provide a cause of action for aggrieved healthcare providers that treat ERISA participants. Well, but that was true in Bristol. But Bristol said it was tantamount to a claim for benefits because it was ultimately traceable, as here, to a benefits claim that was then assigned and then assigned, essentially, but a benefits claim by a petitioner, by a participant. Well, the issue in Bristol was, and I think two points are really significant to distinguish it in terms of the facts. I think it came out correctly because what the court saw there was that Bristol was trying to do an end-around. But wasn't the really key difference between Bristol in this case? There were two. One is that was a contract claim, claiming that there was a contract formed other than the ERISA plan contract, right? And that it was, but perhaps more importantly, there was no misrepresentation claim because the reason they didn't pay didn't even exist at the time of the call, right? In other words, they didn't pay because of this fee problem, and that didn't exist at the time of the call. So what they said at the time was accurate. Here, your claim is that what they said at the time was a misrepresentation and misleading and you're not claiming that there's a contract that was formed. You're claiming that there was a misrepresentation that led to your detriment. So it seems to me that there are two key differences. There are. Well, could I follow up on Judge Berzon's question? Ultimately traceable. Isn't this still ultimately traceable to the plan? And let me be specific. If your state law claim were to proceed, wouldn't you have to erase portions of the plan pertaining to the rate of reimbursement, specifically at around 84 to 86 of the plan? No, Your Honor. No. So your state law claim does not require you to rewrite the underlying plan. Absolutely not. Absolutely not. So that's the point. So I think actually, as I was sitting in the courtroom actually today, I wanted, I knew the court, I sort of was trying to feel out what kind of questions the court was going to ask. And I was thinking about it, if the plan paid more than what was represented, if ultimately, let's say I had an ERISA claim, like let's say I was able to assert an ERISA claim, I had standing to pursue an ERISA claim, and the plan were to give me the opportunity to get more than even... I'm just going to cut with your times tight. The plan exists, and this is a debate about reimbursement rates. How is that not derivative of the plan? Because we're not asking, because they have no rights under the plan. They have no standing under the plan. They can't... Well, but that's because your client's a bill collector, right? In other words, the peer had rights. No, absolutely not. There's an anti-assignment provision. I felt the anti-assignment provision extended to your client, but not to the surgical center. Absolutely not. The anti-assignment provision is for all, and this has become ubiquitous throughout the insurance industry. They put in all these insurance plans, and this was mentioned in the plastic surgery case, and it's mentioned in a whole bunch of other cases, is now that insurance companies are specifically putting into plan documents anti-assignment provisions, which preclude the provider... I mean, the circuits are all over the place on whether or not these state law claims can proceed. What's your best authority for they can because of the anti-assignment clause? Is that the thrust of your argument? No, that's not... I'm pointing that out because the court was mentioning it. There's simply no ability in any circumstance when they put this anti-assignment language, if they properly mention it in the explanation of benefits, if they properly mention it in the documents, this will preclude a provider, a doctor, from being paid even under ERISA. You could not... If they properly assert it... Okay. Now we're getting into policy discussion. Are you relying on that final paragraph that refers to access med-equip? Is that your theory as to why you... Access med-equip is my theory. Access med-equip is my case. Access med-equip is where I come from. That is everything. That is... I mean, the language of access med-equip is, I think, that is literally the way in which I would... I view my case and the way in which I view all of these cases. And that had a very tangled procedural history. It did. Your Honor is familiar with it. So it did, but then ultimately they ended up saying that to the extent that all those other cases were inconsistent with access, that you guys overruled it. So at least that's my understanding. Not you guys, but... I apologize. Wasn't the policy there one that was entirely separate, independent from the plan? In other words, it was essentially a sort of anti-fraud policy. We will not accept any requests from providers that don't have surgical centers? No, that's not the language. The language of access is that it goes... The language of access is, it says, it doesn't... The state law underlying accesses misrepresentation claims does not purport to regulate what benefits United provides to the beneficiaries of its ERISA plans. And the same thing is true here. If there were no plan, if there simply were no plan here, let's say they didn't exist. It was like meadows, perhaps, where there was no plan. If it simply didn't exist, the claim would still proceed. We don't need to ever look at the plan document. The information... But the plan did exist is your problem. So the question... But in Access MediQuip, it did exist. In Access MediQuip, it did exist. And even the United's counsel, Respondent's counsel, they were trying to make this distinction by saying extent of coverage versus coverage versus all these different things. And Access was very clear to say, no, in any one of these circumstances, it doesn't make a difference. But the question ultimately is whether access is consistent with Bristol. Yes. And Bristol did not address exactly the same question. That's clear. Right. And so is it your position that we could basically follow Access and say that Bristol did not address the same issue? I think that's right. I think that's absolutely correct. I think that's absolutely right. Bristol did not... It specifically was not addressing... But there's some language in it about... There is language. There is language in it. It cuts very, very wide. It seems like the language cuts very, very wide. But it did leave that paragraph in at the end. It did leave the reference to Access. It did leave the reference to Lordman. And also it was dealing with a situation where they were trying to have a contract claim and they were trying to deal with something that didn't exist at the time. That's correct. And trying to superimpose that contract claim so that they could get... They specifically said, we want the ERISA benefits, but we're being precluded because of this fee forgiveness issue. So let's try to see how we can avoid that. You're very confident in your factual representation that the position you're urging would not impugn or implicate any terms in the plan. Correct. I don't need the contract. Not whether you need it or not. The plan says nothing about reimbursement rates as distinct Medicare versus the UCR rates. The plan may say things and we may... At some point, the plan could be evidence of a misrepresentation. But whether the plan is there or not is not... Well, the plan specifies a term of reimbursement. Sure. And your state law claim says, no, I'm relying on a promise that gave us a higher term. That seems to me to be implicating the plan. No, because we're not saying it's a higher term. We're just saying that's the term. You said you're going to pay as usual, customary, and reasonable, irrespective of what... To me, looking at the scholarship is trying to make sense of old circuit splits that, as far as I can tell, still exist. A lot of the scholars are saying the critical question is, would the state law claim implicate something that is in the contract? If so, it's trying to attack the ERISA bargain. That's why I keep pressing you on... I don't agree with any case that you're talking about. That's why I'm pressing you on your answer to me at the outset, where you said confidently the reimbursement rates are not specified in the claim. Are you revising that answer or not? No, the rate they promised was not stated in the plan. Okay. Counsel, if I understand your claim, is that because you made this pre-treatment call and to confirm the rate, and there was a representation made about the rate, it just doesn't matter what the plan actually provides about the reimbursement rate, because what the plan or what you are owed is what was represented in the phone call, and that the theory is, you know, if another provider providing the same exact health care service did not make that phone call, and they were not reimbursed at the usual and customary rate, they would have no claim unless the plan actually provided for usual and customary rate, then the beneficiary of the plan could sue under ERISA, but the provider would have no claim because they had not been misrepresented to about the UCR. And if you win, if you were to prove all the facts as alleged and were to win, a win would not actually change the terms of the plan or the reimbursement owed to any other provider. It would be based solely on the misrepresentation made. But you do have to prove, to prove a misrepresentation, you have to prove that they knew otherwise. And does your complaint or otherwise, how are you going to prove that they knew otherwise? So ultimately at the end, what they pay is, you can figure that out. So if they pay, if they say they're going to pay usual, customary, and reasonable, there's stuff in the industry that clearly indicates the usual, customary, and reasonable does not mean Medicare. I think the AMA puts out a thing that says specifically... Well, but it's possible at the time they said UCR, they thought that was right, and it turned out to be wrong. In other words, in order to prove misrepresentation, you have to prove that at the time that they said... That's true. All of that's possible. All of those things are possible. We're at the motion to dismiss stage. All of that's possible. And so we might lose. We might lose on, we might lose on summary... What is your allegation in the complaint concerning that question? That they knew. In the allegation also, there was a specific question about whether they paid the Medicare rate. Correct. They asked that, they asked that also. Correct. They asked them both questions. They say, did you pay based on UCR? Did you pay based on Medicare? They asked both of those questions. I actually just listened to a phone call involving Lapeer and an insurance company recently. So I'm familiar with hearing those transcripts of those calls. So it may even involve the same counsel. So yeah, it's absolutely, they said those things. It stands on those things alone. If we're not able to prove that they knew, then we lose. But I don't think we lose here. I think we lose at summary judgment. But if you go ahead and try and prove that they knew by looking at the actual plan, would that matter? I think the case law, I think the case law says no. I think the case law says no, but I don't, but and so if I, if we end up, if the court wanted to put into its opinion to say that if we ultimately have to, if we had to ultimately do that, that we would then lose. I don't think I would even have an issue with that. I think that would still be fine. I think there's still case law out there. I think plastic is one of those cases. I had a case before the California Court of Appeal. I didn't cite it in this because I'm sure the court doesn't really care about what the California Court of Appeal has to say. But it was Silver v. ILWU. And in that case, the court said at some point in time, the same language, it's always the same language. At some point in time, the plan is involved. But that's still not enough. But I don't even need that. I don't even need to go there. I don't even care about the plan. But the plan is an indice of the, I mean, there's a line of collective bargaining cases, which has a similar preemption world in which looking to the collective bargaining agreement just for the rate is not preemptive. So it would be parallel to that.  All right. Okay. We'll give you three minutes. Good morning. May it please the court. My name is Jonathan Herman. I have the privilege of representing WSP, USA Incorporated, and Aetna Life Insurance Company. There is a single issue before this court for consideration. I will rephrase it ever so slightly from appellant's counsel. But there is a single allegation directing specifically to Judge Higginson, your inquiry. There's a single allegation appearing at ER 73. It's paragraph 76 of the third amended complaint, that above all other allegations that have been cited in the party's pleadings, directly responds to your question, Judge Higginson, and it directly answers that issue in appellee's favor, illustrating that Judge Gee's decision was correct. Paragraph 76, second sentence, I quote, defendant did not pay medical provider in accordance with the specific health plan term. The single issue before the court is whether the provider's verification of plan benefits call to Aetna, inquiring of the patient's payment obligations under the plan, and the plan's... They also had an ERISA claim, which ended up dying off. But that provision would have been relevant to that. But their contention is it's not relevant to the state law claim that's at issue now. I understand that may be their contention for purposes of this appeal, but it was asserted in the third amended complaint. And when you add in paragraph 81 of the third amended complaint at ER 73, where the provider alleges the amount paid did not afford it a reasonable profit. You heard his answer, access mediquip is everything. So I'd like you to address what do you think Bristol stands for on the preemption line of authority? And it is true that at the end of Bristol, the court, the Ninth Circuit purports to reconcile access mediquip. So I have a two part question. What does Bristol say is the law in the Ninth Circuit? And then what's the space that's left for access mediquip? Bristol puts forth two underpinnings, impermissible connection with and reference to. Those are the two guideposts, the two underpinnings by which facts are determined as to whether the claim is preempted. I'm sorry, Your Honor, I lost track of your second question. Well, opposing counsel said access mediquip is everything. It's a Fifth Circuit case. I know it well. I'm asking you when the Ninth Circuit does at the end, the final paragraph, reconcile access mediquip. What's the sort of inroad that you perceive access mediquip doing to what I perceive to be a very broad Ninth Circuit preemption rule? I don't see access mediquip affecting one way or the other the Bristol decision. The Bristol decision is the law of this circuit.  But the court did leave space. And so if I remember the facts correctly, there you have an insurer with a policy that says we're not going to pay, what is it, providers that don't have a surgery, essentially, a surgeon at the center. So there's a policy that seems to be pretty independent of the underlying ERISA bargain. Arguably, that's true here. This is a rate reimbursement. It doesn't affect the bargain between the ERISA participants. It's not a patient coverage term. With respect to the policy notion, I'm unprepared to speak to policy notions. We're trying to assemble facts to determine whether or not they fit within certain processes. I don't want to ask too many questions, but I guess in the plan here, yes or no, does it specify the rates of reimbursements? And therefore, would a state law claim necessarily have to impugn facts in the underlying contract? Yes. The plan in this case, and as alleged in paragraph 75, ER 72 of the paragraph 75 of the third amended complaint, the provider recites, block quote, recites the plan provision regarding FCR, facility charge review. You're relying on the allegations in the complaint, which include an ERISA claim. So putting aside the allegation of the complaint, how does the claim that is based on state law negligent misrepresentation depend on what the terms of the plan are? Because the object of the claim is inextricably intertwined with the relief sought. And I must say that whenever I hear inextricably intertwined, I think there's a fuzziness going on. Let's say there was a call from the provider and says, what's the reimbursement rate? And they say it's $100. And then it turns out they only get paid $10. And the defense is the plan actually only requires us to reimburse $10. And the claim is, well, then you shouldn't have told me $100. That was negligent misrepresentation and I wouldn't have gone forward with the treatment unless if I had known they were only going to reimburse me $10. How does that claim, based on the statement in the phone call that we'll reimburse you $100, how does that turn on what the plan says? I can certainly envision, perhaps over an adult beverage, any type of different scenarios by which there is a conversation between an out-of-network provider and a health plan that would involve an inaccuracy. However, with respect to the claim, putting aside the state law elements which have to be proved of the negligent misrepresentation claim, it does track back to the plan because as Bristol noted, number one, verification of benefits phone calls exist all the time. Number two, Bristol noted that we do not want to allow plan administrators to be bound by whatever is said in that phone call. But that's the point. They're not, as your opponent said, he's not saying that you're, this is not a contract claim and they're not claiming that you are bound by what you said in any contractual sense and they're not trying to override the contract. What they're saying was that you misrepresented what was in the contract or you misrepresented what you were actually going to pay them, whether it was in the contract or not. And so why isn't that a fundamental differentiation as well as the fact that in Bristol there couldn't have been a misrepresentation because the reason they didn't pay in the end was something that they didn't even know at the time of the call, which presumably is why it wasn't a misrepresentation claim. Bristol actually addressed that when discussing the impermissible connection with Prong, where Bristol said the plan administrator can't be stripped of its ability to enforce the plan terms, whether related to fee forgiveness or otherwise. All right, but then at the end, as Judge Hankinson has been saying, it says specifically that the cases, including Access MediQuip, are distinguishable because here there is no evidence that the patients in question were ineligible for coverage at the time of the verification and authorization calls. That's one of my points. Or that Cigna misrepresented patient coverage or the extent of coverage during the calls. And here the allegation is that they did know that they were going to get the Medicare rate and not the UCR rate. And that Cigna therefore misrepresented the extent of coverage during the call. So why isn't that precise? Why isn't this case precisely with what was left, precisely what was left open in Bristol? Even, forgive me, Your Honor, I got slightly lost in your question. Well, I was simply reading what was here. I can read it again. Okay. What strikes me is the overarching Supreme Court guidance concerning the enforcement. Why don't you answer the question? Which is, isn't this case precisely within what was left open in Bristol? I don't believe so. I believe that Bristol set forth our two guideposts, our two underpinnings for the review of these. But that's not the question. The question is whether the language that I read you precisely applies to this case and therefore is not within Bristol because Bristol says it is. I don't believe, I'm sorry if I'm not answering your question directly, but I don't believe, I believe Bristol stands for the proposition.  Your point is something specific. Why do you think this case is distinguishable from access MediQIP? And it's essentially a variation of the same hypothetical I gave you, which I don't think you answered either. Specifically, why don't you think that hypothetical or this case is, why is that distinguishable from access MediQIP? Because if the, I see I'm close, if I may have another, thank you. The answer, the answer to your first question about the $100 and the $10 situation in the absence of any other context, then perhaps that might give rise to the, a negligent misrepresentation claim. But I still believe that Bristol addresses this question under the analytical framework that Bristol articulated. But then it says it isn't. So since it says it isn't, why don't we believe them? Right. So are you arguing Bristol, notwithstanding this paragraph, distinguishing access MediQIP is actually foreclosing these type of negligent misrepresentation claims? I'm arguing that Bristol forecloses this negligent misrepresentation claim. So if it leaves open some, if it preserves the negligent misrepresentation claims expressly referred to in this paragraph, why is this case meaningfully distinguishable from those cases? Because this case specifically points to a plan term and says, I did not get paid according to that plan term. And you're basing that on the factual allegation in the complaint. Factual allegation. And also paragraph 41, where the provider... How does the negligent misrepresentation claim depend on that particular factual misrepresentation? Because in paragraph 41, the provider alleges that if he is not paid according to the phone call, he should be paid according to plan terms. In the alternative and separately. That's what 41 says. Because 40 says, when a medical provider, like plaintiff is told the defendant will be paying a claim into UCR, plaintiff expects that it will be utilizing the fair health data which it calculates. In the alternative and separately, their own proper reimbursement in accordance with the patient's health plan. So if anything, that makes clear that there are two separate theories. One is based on a plan and the other one isn't. That may be Your Honor's view of it, but considering that all of the allegations are incorporated in paragraph 81... In the alternative and separately. But also paragraph 75, 76, and 81, which are also incorporated in the negligent misrepresentation claim found at paragraph 82... Do you have anything based on the nature, the legal elements of the negligent misrepresentation claim? That require... That distinguish this negligent misrepresentation claim from the ones referred to in the last paragraph of Bristol? The damages. The provider is arguing that it is entitled to be paid a reasonable profit. Now, perhaps there's alternative or separate claims. I certainly recognize Judge Berzon's... Well, a court could say, well, we don't agree with your theory of damages under the negligent misrepresentation claim. This is what you're actually entitled to, correct? Well, what one would have to look to, what you're actually entitled to is under the plan is what you have to... Well, under the negligent misrepresentation claim, they're saying they're entitled to what was promised in the phone call. What was promised in the phone call, if it's accurate as it reflects to the plan... They have to prove their call, right? Yeah, I agree they have to prove their call, but certainly the plan, what the plan covers vis-a-vis the member, that plan is responsive to the damage claim insofar as it's a determinator of the damages. Well, my hypothetical, my understanding, at least, is if there was a promise to pay $100 and they approve everything they need to enforce that promise and they get, as damages, the difference between the promise on the phone call and what they were actually paid. And it doesn't matter what the plan itself says, should or should not be paid. In a pure mathematical sense, that is correct. Okay. Yes, I... Thank you, counsel. Are there any other questions? No. Okay. Thank you. Thank you. I'm picking up a lot of time already. I don't have anything. I don't have anything. The court made all the questions for me. So if the court has any further questions for me, I'm here to answer. But otherwise, I don't want to waste any more of the court's time. Do you have any more? Okay. Thank you, counsel. Thank you, Your Honor.  Okay. Next, we have Insinkerator v. Jernicka.
judges: BERZON, Higginson, SUNG